```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
                  NORTHERN DIVISION
                    AT COVINGTON
```

**CIVIL ACTION NO. 2008-154 (WOB)**

**CHARLES KOWOLONEK**                                          **PLAINTIFF**

**VS.**                           <u>**OPINION**</u>

**OFFICER LES MOORE, ET AL.**                                  **DEFENDANTS**

The court, having previously granted defendants' motion for summary judgment after a hearing (Doc. #32), now issues the following Opinion setting forth the reasons for that ruling.

*Factual and Procedural Background*[1]

The events in this case stem from plaintiff Charles Kowolonek's encounter with defendants on the morning of August 22, 2007.

On that date, Kowolonek, who is biracial, was at the home of his mother, Marjorell Kowolonek, in Florence, Kentucky. Plaintiff's girlfriend, Miranda Wallace, was also at the home. Kowolonek's mother had just arrived home after working her third-shift job, and she had argued with plaintiff and Wallace about the fact that they did not have jobs.

After Kowolonek's mother went to her bedroom to go to sleep, Kowolonek went outside and began playing with a soccer ball in

---

[1] The facts are undisputed unless otherwise noted.

the back yard.  Kowolonek accidentally kicked the ball through his mother's bedroom window, breaking the glass.  Kowolonek went inside to tell Wallace what happened and said that he was going outside to smoke a cigarette.  Kowolonek walked to the front of the house, and Wallace went to get a broom to clean up the glass.

Meanwhile, a neighbor, Joe Derzan, heard the breaking glass, saw Kowolonek and Wallace (whom he did not recognize) walking in and out of the house, and called 911 and reported a suspected burglary.  Derzan told the dispatcher that a Puerto Rican male who had short hair and was wearing a gray t-shirt had entered the home with an unknown subject.

In response to the 911 call, officers were dispatched to the address.  Florence Police Officer Les Moore was the first to arrive.  Moore observed Kowolonek, who was wearing a gray t-shirt, walking around towards the front of the house.  Moore told Kowolonek that there had been a report of a burglary.  (Kowolonek Depo. 127)  Kowolonek said there had been no burglary and that he lived there.  (*Id.* at 128)  Moore asked Kowolonek who lived at the house and whether he had any identification.  Kowolonek responded, "I don't need any ID, it's my fucking house."  (Moore Depo. 55)

From the outset of this conversation, Kowolonek was trying to light a cigarette, and Moore told him several times not to do so.  Kowolonek then stated that he wanted to go into the house,

2

but Moore told him to "just hang on a minute and we'd get it worked out." (Moore Depo. 57) Kowolonek walked to the front porch and stated, "Fuck this, I'm having a cigarette." (Moore Depo. 58) Moore then grabbed the cigarette out of Kowolonek's mouth and put it on the ground. Kowolonek then stood up and reached for the door, apparently to go inside,[2] and Moore put his hands on Kowolonek's right shoulder. Kowolonek asked Moore, "What's going on?" and Moore responded that he was not going to arrest Kowolonek, and he attempted to place a handcuff on plaintiff's wrist. The two men began to struggle physically.

Wallace then came around the house, identified herself as Kowolonek's girlfriend, said he lived there, and that his mother was in the house. Wallace observed that Kowolonek had one hand on the front door and it appeared to her that he was trying to enter the house. (Wallace Depo. 33, 36) Wallace testified that Kowolonek stated, "You're not going to arrest me in my own front yard," and that he was holding his arms taut to prevent Moore from handcuffing him. (Wallace Depo. 36, 46, 65) Wallace approached the men, but Moore ordered her to move away, so she went into the house to wake up Kowolonek's mother. As Wallace walked by, Kowolonek let go of the door, lost his balance, and he

---

[2]As discussed at greater length below, Kowolonek testified that he grabbed the door to steady himself, while both Moore and Wallace testified that he appeared to be attempting to enter the house.

3

and Moore ended up in the yard.  Moore testified that he told Kowolonek to stop resisting or he would get tazed.  (Moore Depo. 65)

At this point, Moore radioed for backup.  Three other Florence Police Officers – Carl Agner, Steve Butts, and Jason Reed – arrived on the scene.  Shortly thereafter, Boone County Sheriff's Deputy Jim Hill arrived.  Hill asked Moore if he should taze Kowolonek to get him under control, but Moore said, "No, just help me get him handcuffed."  (Moore Depo. 72; Butts Depo. 28-29; Agner Depo. 24)  Kowolonek's mother, who by this time had woken up, began yelling from an upstairs window for the officers not to hurt her son because "he had not taken his medication."  Wallace and Kowolonek's mother also yelled at Kowolonek to cooperate with the police.  A neighbor, Kay Hill, came into the area, tried to calm Kowolonek down, and told the officers that Kowolonek lived there.

The officers were then able to place the handcuffs on Kowolonek.  During this episode, Kowolonek did not strike the officers and the officers did not strike him.  Kowolonek testified, however, that one of the officers tazed him but he cannot identify the officer who did it.  Wallace testified that she saw an officer in a brown uniform push a small black object that she believed to be a taser into Kowolonek's back.  (Wallace Depo. 44, 80-81)  Officers Moore, Agner, Reed, and Butts deny

4

having tazed Kowolonek.  They saw Boone County Deputy Hill draw his taser, but testified that it was not deployed.  The record reflects that Florence police officers wear black uniforms and that the tasers issued to them are yellow.

Once handcuffed, Kowolonek was placed in the back seat of Reed's cruiser.  Moore and Agner then went into the house and spoke with Wallace and Kowolonek's mother.  The two women confirmed that Kowolonek lived at the residence and that there had been no burglary.  After about five minutes, Kowolonek was released from the cruiser and the handcuffs were removed.

Plaintiff filed this action on August 18, 2008, alleging the following claims: (1) Excessive force (42 U.S.C. § 1983); (2) Unlawful arrest (42 U.S.C. § 1983); (3) Conspiracy to deprive plaintiff of his constitutional rights (42 U.S.C. § 1985); (4) Common law wrongful arrest; and (5) Common law assault and battery.

The parties filed motions for summary judgment, which the court heard on March 11, 2010.  The court granted defendants' motion by order dated March 17, 2010 (Doc. #32).

*Analysis*

**A.     Wrongful Detention/Arrest (42 U.S.C. § 1983)**

    **1.     Constitutional Violation**

The court concludes that this claim should be dismissed because plaintiff's detention was proper because Officer Moore had "reasonable suspicion" to conduct an investigative *Terry* stop and, further, that the detention of plaintiff never ripened into an arrest.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The Fourth Amendment is made applicable to the states by its incorporation into the Fourteenth Amendment. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 302 (6th Cir. 2005).

An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop. *Smith*, 594 F.3d at 536 (citing *Terry v. Ohio*, 392 U.S. 1, 22-24 (1968)). An officer can stop and briefly detain a person when the "officer has reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *Id.* (citation omitted) (emphasis in original).

"The standard outlined in *Terry* and its progeny is not onerous." *Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 813 (6th Cir. 1999). "The requisite level of suspicion 'is considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 17 (1989)). "Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause." *Id.* (citations omitted). The determination of whether reasonable suspicion existed is made in light of the totality of the circumstances. *Smith*, 594 F.3d at 537.

The court must also determine whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances. *Id.* (internal quotations and citation omitted). "The scope of the investigative stop depends on the circumstances that originally justified the stop," and "it is appropriate to consider whether the law enforcement officer diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (internal quotations and citation omitted).

Applying these principles to the undisputed facts in this record, the court concludes that Officer Moore had reasonable

suspicion to take reasonable action to restrain plaintiff to investigate whether plaintiff was involved in the reported burglary based on the information Moore was given by the dispatcher. *See id.* at 540 (noting that a 911 call is significant factor in *Terry* analysis). The 911 caller reported that there was a male subject wearing a gray t-shirt at the address in question, that he did not recognize the subject as a resident of the home, that he had heard breaking glass, and that he had observed the subject and another unidentified person entering the home. When Moore arrived at the home, he observed plaintiff – a male who was wearing a gray t-shirt – walking around from the side of the house. This consistency with the dispatcher's report provided reasonable suspicion for Moore to restrain plaintiff to investigate him in possible relation to the reported crime.

　　The events that ensued appear to have been triggered by plaintiff's uncooperative responses to Moore's attempts to determine who plaintiff was and what had transpired. Although plaintiff testified that he told Moore that he lived at the home, Moore was entitled to verify that assertion and to investigate further to determine whether a crime had, in fact, occurred. Plaintiff's argument that any reasonable suspicion effectively evaporated once plaintiff made the statement that he lived at the address is not well-taken.

8

Further, plaintiff concedes that, at the time Officer Moore arrived, plaintiff was already upset by the argument with his mother and his concern over the broken window, which he feared would anger his mother's boyfriend. (Kowolonek Depo. 121-22). Wallace testified that plaintiff was "real mad" and "angry" about the window. (Wallace Depo. 23, 26) Officer Moore testified that, when he initiated the conversation with plaintiff, plaintiff appeared "a little agitated." (Moore Depo. 55)

Further, although Moore instructed plaintiff not to continue in his attempts to light a cigarette,[3] plaintiff admits that he ignored those instructions. In combination, plaintiff's agitated demeanor and refusal to obey Moore's instructions support the conclusion that Moore's continuing efforts to investigate the situation, and to restrain plaintiff in the meantime, were reasonable. See *Smith*, 594 F.3d at 540-41.

Once Moore took the cigarette out of plaintiff's mouth, plaintiff made what Moore interpreted as an attempt to enter the house, against Moore's instruction that plaintiff remain on the porch. Although plaintiff testified that he was not actually trying to enter the house, but was instead merely trying to steady himself, Moore's inference that plaintiff was trying to enter the house was an objectively reasonable one. Indeed, Wallace also testified that it appeared to her that plaintiff was

---

[3] The lighted cigarette could have been used as a weapon.

9

attempting to enter the house, which supports this conclusion.[4]

It was at that point that Moore placed his hand on plaintiff's arm to prevent him from entering the home.  Moore then began to attempt to handcuff plaintiff, an action which was reasonable given plaintiff's apparent attempt to evade Moore.  According to both men, they then lost their balance and "ended up" in the mulched area below the porch.  Importantly, plaintiff concedes that he held his arms taut to prevent being handcuffed, which was also the testimony given by Wallace.  Moore then called for backup.  The backup officers arrived, and plaintiff was successfully handcuffed and placed in the cruiser.

The Sixth Circuit has held that "[n]either the use of handcuffs nor detention in a police cruiser transform an investigatory stop into an arrest so long as the circumstances make it reasonable for the officer to take these precautions." *Williams v. Leatherwood*, 258 Fed. App'x 817, 822 (6th Cir. 2007) (citing other Sixth Circuit cases so holding).  *See also United States v. Shank*, 543 F.3d 309, 314 (6th Cir. 2008) (detention of suspect in police cruiser did not exceed scope of valid traffic stop; detention lasted 15 minutes); *United States v. Wilson*, 199 Fed. App'x 495, 497 (6th Cir. 2006) (15-minute detention of suspect in police cruiser did not transform *Terry* stop into

---

[4]If a burglar were permitted to enter the residence, he might harm the residents or take a hostage.

10

arrest); *Radvansky v. City of Olmstead Falls*, 395 F.3d 291 (6th Cir. 2005) (reasonable suspicion that supports *Terry* detention also may make use of handcuffs and detention in police car reasonable); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 -15 (6th Cir. 1999) (*Terry* stop did not ripen into arrest where plaintiffs were detained at gunpoint, handcuffed, and held in police cruiser for approximately 30 minutes before being released).

Given this rapidly evolving sequence of events, it was reasonable for Moore to restrain plaintiff in the cruiser so that he could investigate the situation. Moore proceeded immediately to question Kowolonek's mother, the occupant of the home, who confirmed that plaintiff was her son and lived at the residence. As soon as Moore determined with certainty that plaintiff lived at the home and that no crime had occurred, plaintiff was released. Plaintiff testified that he was in the cruiser for "approximately five minutes." (Kowolonek Depo. 183)

Therefore, even viewing the record in the light most favorable to plaintiff, the court concludes that no unlawful detention or arrest occurred.

### 2. Qualified Immunity

Even if this court were to conclude that plaintiff's detention was constitutionally infirm, summary judgment in defendants' favor is nonetheless warranted on the grounds of

11

qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

The qualified immunity analysis comprises two questions: (1) whether the plaintiff has alleged facts which, when taken in a light most favorable to him, show that the defendant's conduct violated a constitutionally protected right; and, if so (2) whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).

"The burden of showing that the right was clearly established 'rests squarely with the plaintiff.'" *Perez v. Oakland County*, 466 F.3d 416, 427 (6th Cir. 2006) (quoting *Key v.*

*Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999)).

Moreover, the plaintiff must show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Saucier*, 533 U.S. at 201). "If reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be recognized." *Id.* (citation omitted).

For the same reasons as those discussed above, the court concludes that no reasonable officer in defendants' positions would have believed that they were violating plaintiff's Fourth Amendment rights. Moore reasonably perceived that he had the requisite suspicion to detain plaintiff while he investigated the situation and, given the turn of events, his decision to handcuff plaintiff and place him in the cruiser while he did so was objectively reasonable. In addition, the individual defendants other than Moore – the officers who arrived on the scene only after the struggle between Moore and plaintiff had begun -- reasonably perceived the need to assist Moore in restraining a suspect who appeared to be in a physical altercation with an officer responding to a burglary call.

Thus, the individual defendants are all entitled to qualified immunity on plaintiff's wrongful detention/arrest claim.

13

**B.   Excessive force (42 U.S.C. § 1983)**

In determining whether a constitutional violation based on excessive force has occurred, the court applies "the objective reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

Considerations relevant to this analysis include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 354 (citation omitted).

The question of whether an officer's actions were objectively reasonable "is a pure question of law" for the court. *Id.* at 353 (quoting *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007)).

Considering the above factors, and viewing the situation from the perspectives of the officers on the scene, the force

used by defendants here to restrain plaintiff was objectively reasonable under the circumstances.

First, no force whatsoever was employed until plaintiff stood up from where he was seated on the porch and placed his hand on the door, a movement that Officer Moore reasonably construed to be an attempt by plaintiff to enter the house, against Moore's instructions. At that point, Moore placed his hand on plaintiff's shoulder to stop him from entering the house and began to attempt to place a handcuff on plaintiff's wrist. The court concludes that such force was objectively reasonable given Moore's reasonable perception that plaintiff was attempting to evade him, at a time when the officer had not yet confirmed plaintiff's identity or determined whether a burglary or other crime had occurred. *See Slusher v. Carson*, 540 F.3d 449, 456 (6th Cir. 2008) ("In determining whether force was excessive, we often must assess the actions of the plaintiff."). Importantly, plaintiff does not allege that Moore exerted any other force at this point other than the attempted placing of the handcuff.

At that point, the two men began to struggle and fell off the porch. Plaintiff does not allege that he was pushed; instead, the testimony is simply that the men lost their balance.

Further, it is undisputed that plaintiff refused to put his arms behind his back and instead held them taut to prevent from being handcuffed. Officer Moore, and then the several officers

15

who arrived as backup, therefore employed the force necessary to complete the handcuffing. Plaintiff testified that, during this encounter, he was never struck, kicked, or taken to the ground. Instead, all men involved remained standing.

It was objectively reasonable for the officers to conclude that, given plaintiff's resistance, they would have to force his hands behind his back in order to handcuff him. This is particularly true as to the backup officers, who arrived on the scene to find plaintiff and Moore engaged in a physical struggle. *See Dunn*, 549 F.3d at 354 ("When Sergeant Porter arrived on the scene, he saw an apparent struggle between Dunn and Officer Matatall, giving him ample reason to believe that Dunn was a threat to the Officers' safety.").

Under these circumstances, the court concludes that it was objectively reasonable for the officers to use force that was sufficient to allow plaintiff to be handcuffed in order to neutralize him while the officers completed their investigation. *See id.* at 355 (noting that not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment") (quoting *Graham*, 490 U.S. at 396).

Plaintiff's allegation that he was tazed also raises no issue of fact as to excessive force by these defendants. The evidence is undisputed that the Florence officers – who are the

16

only individual defendants here -- wore black uniforms, while the witnesses testified that the officer who allegedly deployed his taser was wearing a brown uniform which, the evidence also shows, is the color worn by Boone County deputies.  The only reasonable inference then is that, even accepting plaintiff's testimony as true, it must have been the Boone County Sheriff's Deputy who deployed his taser on plaintiff.  That officer was not named as a defendant in this case, nor is there any testimony from him in the record.

   Plaintiff attempts to create a triable issue as to the identity of the alleged tazing officer through the testimony of Wallace that the tazing was done by the "last officer to arrive" (a Florence officer), but her testimony on that point is a red herring.  As defendants note in their reply brief, Wallace testified that she saw only three officers arrive on the scene, while the evidence is undisputed that there were, in fact, a total of five officers dispatched to the address.  Wallace's testimony that the alleged tazing was done by the "last officer to arrive" thus raises no *genuine* dispute of material fact.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (noting that when a witness's testimony is blatantly contradicted by the record, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment).  This conclusion is supported by the fact that Wallace otherwise testified that the

alleged tazing officer wore a brown uniform, and it is undisputed that defendants here all wore black uniforms.

For all these reasons, defendants are entitled to summary judgment on plaintiff's excessive force claim.[5]

### C.   Conspiracy (42 U.S.C. § 1985)

Plaintiff states in his opposition memorandum that he is withdrawing this claim.

### D.   Liability of the City of Florence

Under § 1983, a municipality can only be liable if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom. *Slusher*, 540 F.3d at 456 (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)).

The court having already determined that plaintiff's constitutional rights were not violated by defendants, his claim against the City of Florence necessarily fails as well. Moreover, the court also concludes that plaintiff has adduced no evidence of any policy or custom of the City that would be related to any such violation. For example, there is no evidence that any of these defendants had previously engaged in excessive force, or that the City fails to maintain policies or adequately train its officers as to the use of force. While plaintiff

---

[5] And, for the same reasons, defendants would be entitled to qualified immunity on this claim even had a constitutional violation been established.

argues that the City's failure to discipline the officers *after* this incident, such failure could have caused plaintiff no cognizable constitutional injury. *Id.* at 457 ("To the extent that Slusher complains that the county's policies were deficient regarding investigations of citizen complaints, Slusher has alleged no injury stemming from any deficient investigation techniques, as all of her injuries stem from the [] alleged seizure and not from anything that occurred after.").

Summary judgment on the claim against the City is thus also appropriate.

E. **State Law Claims**

Because the court is dismissing plaintiff's federal claims, it will decline to exercise its supplemental jurisdiction over plaintiff's state law claims and dismiss them without prejudice. *See* 28 U.S.C. § 1367(c)(3).

A judgment shall enter concurrently herewith.

This 25th day of March, 2010.



Signed By:
*William O. Bertelsman* WOB
United States District Judge